# EXHIBIT 5

Page 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

_____

DEVELOPER RE1, LLC,

    Plaintiff,

  v.                               No.

DP CAPITAL, LLC d/b/a WASHINGTON   2022-CAB-005935

CAPITAL PARTNERS, et al.,

    Defendants.

_____

DEPOSITION OF

DANIEL HUERTAS

DATE:          Wednesday, July 19, 2023

TIME:          10:01 a.m.

LOCATION:      Greenstein DeLorme & Luchs, PC

               801 17th Street Northwest, Suite 1000

               Washington, DC 20006

REPORTED BY:   Matthew Yancey, Notary Public

JOB NO.:       6012872

PAGES 87-100, 105-222, 251-287 ARE CONFIDENTIAL

Page 2

1      A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF DEVELOPER RE1, LLC:
3      JAMES D. SADOWSKI, ESQUIRE
4      ALEXANDRIA J. SMITH, ESQUIRE
5      Greenstein DeLorme & Luchs, PC
6      801 17th Street Northwest, Suite 1000
7      Washington, DC 20006
8      jds@gdllaw.com
9      ajs@gdllaw.com
10     (202) 452-1400
11
12 ON BEHALF OF DEFENDANTS:
13     MAURICE B. VERSTANDIG, ESQUIRE
14     The VerStandig Law Firm, LLC
15     1452 West Horizon Ridge Parkway, Suite 665
16     Henderson, NV 89012
17     mac@mbvesq.com
18     (301) 444-4600
19
20 ALSO PRESENT:
21     Mel Negussie, Developer RE1, LLC
22

Page 4

1      I N D E X (Cont'd)
2  QUESTIONS INSTRUCTED NOT TO ANSWER
3      PAGE           LINE
4      27             19
5      34             6
6      50             15
7      51             10
8      110            12
9      269            8
10     274            8

Page 3

1      I N D E X
2  EXAMINATION:                          PAGE
3    By Mr. Sadowski                      7
4
5            E X H I B I T S
6  NO.      DESCRIPTION                  PAGE
7  Exhibit 1    Plaintiff's requests production    73
8  Exhibit 2    Notice of foreclosure             90
9  Exhibit 3    Complaint Developer RE1, LLC     135
10 Exhibit 4    First amended complaint          138
11 Exhibit 5    Email Thread 4:31                155
12 Exhibit 6    Chart Status Reason              165
13 Exhibit 7    Chart Status Reason WCP 0708     176
14 Exhibit 8    Email Thread WCP 0628            258
15
16
   * retained by Mr Sadowski
17
18
19
20
21
22

Page 5

1      P R O C E E D I N G S
2      THE REPORTER: Good morning. My name
3  is Matthew Yancey; I am the reporter assigned by
4  Veritext to take the record of this proceeding. We
5  are now on the record at 10:01 a.m.
6      This is the deposition of Daniel
7  Huertas --
8      MR. HUERTAS: Yes, sir.
9      THE REPORTER: -- taken in the matter
10 of Developer RE1, LLC vs. DP Capital, LLC doing
11 business as Washington Capital Partners, et al., on
12 July 19, 2023, at 801 17th Street Northwest,
13 Suite 1000, Washington, DC, 20006.
14     I'm a notary authorized to take
15 acknowledgments and administer oaths in the District
16 of Columbia.
17     Additionally, absent any objection
18 before the witness is sworn, all parties and the
19 witness understand and agree that any certified
20 transcript produced from the recording of this
21 proceeding:
22     - is intended for all uses permitted

Page 162

1  Q  Is Paragraph 29 true?
2  A  No, it's not true.
3  Q  Okay. What's not true about it?
4  A  That he didn't make all the payments, it's
5  not true.
6  Q  What payments, as of November 30, 2022, had
7  not been made?
8  A  I don't have the record. So I can't -- I
9  can't tell you. I don't have the record.
10 Q  Okay. Who has that record?
11 A  I don't have the record.
12 Q  I know you don't have the record. You've
13 told me that now twice.
14 A  Yeah.
15 Q  Who has that record of payments as of
16 November 3, 2022, that there was an unpaid balance due
17 at that time?
18 A  Right. The servicing department should have
19 that record. I don't have that record.
20    MR. SADOWSKI: Okay. Just can second.
21 Mel, can I have the Post-its? Okay.
22 //

Page 163

1  BY MR. SADOWSKI:
2  Q  Paragraph 32, Page 5 of Exhibit 4, is that
3  true?
4  A  Paragraph 32?
5  Q  Paragraph 32, yes.
6  A  Okay. Let me read it. No, that's not true.
7  Q  Okay. What's untrue about it?
8  A  Borrower was in default.
9  Q  And how did the WCP -- how do you know that?
10 A  Borrower was in default.
11 Q  Well, in Paragraph 29, you couldn't tell me
12 whether or not the borrow was in default because you
13 didn't have the records or how much was due.
14 A  Right.
15 Q  So how can you say with confidence that the
16 borrower's in default, under 32, if you don't have the
17 records?
18 A  Borrower's that are not current with their
19 payments are in default.
20 Q  Okay. So --
21 A  That's a -- not making their -- not making a
22 payment is a form of default.

Page 164

1  Q  Okay. So as of November 15, 2022, what
2  outstanding payments were there under the loans?
3  A  Like I said, I don't have the record.
4  Q  So you don't know.
5  A  I can tell you that Mr. Negussie was in
6  default.
7  Q  Now, when you say Mr. Negussie is in the
8  default, do you mean RE1?
9  A  RE1.
10 Q  Okay.
11 A  All of the above.
12    MR. SADOWSKI: All right. Okay. It's
13 two pages. You're going to need to find us a stapler,
14 Alex. I don't think you'll have to go far until this
15 stapler arrives.
16    THE REPORTER: Sure.
17    MR. SADOWSKI: Are we on No. 6?
18    MR. VERSTANDIG: There's no Bates on
19 the second page.
20    MR. SADOWSKI: That's because it's
21 all -- it's all one page. I'll represent that --
22    MR. VERSTANDIG: Oh. It's just 54; got

Page 165

1  it.
2     MR. SADOWSKI: -- Exhibit 6 is an
3  enlarged printout of WCP 0054.
4     (Exhibit 6 was marked for
5     identification.)
6     MR. VERSTANDIG: Thank you.
7  BY MR. SADOWSKI:
8  Q  Daniel, let me know when you're done looking
9  at Exhibit 6.
10 A  Sure. Go ahead; ask your question.
11 Q  Oh, okay. What is it?
12 A  It looks like -- I -- I mean, I don't have
13 here the record but payments of the 1 -- RE1, sorry.
14 Q  Okay. Are you able to read the print on
15 this exhibit?
16 A  I don't have the property address here. So
17 I'm sorry. If I don't have a property address or
18 something that can say that to the fact, I cannot -- I
19 can't use this.
20    MR. VERSTANDIG: I'll stipulate that
21 this is counterintuitively 54, which came first in the
22 production, is the second loan to Developer RE1

Page 166

1  secured by 5501/505 [sic] 1st Street.
2       MR. SADOWSKI: Is there another one of
3  these for the first loan in the production?
4       MR. VERSTANDIG: Yeah, I believe it's
5  either 606 or 608 in the production. If I'm off by a
6  few pages, I am not messing with you for sport; I
7  promise.
8       MR. SADOWSKI: Same drill for Margaret,
9  thanks.
10      MR. VERSTANDIG: If it's not 606 or
11 608, look at 806 or 808. I have the ability to jumble
12 numbers in my mind.
13      MR. SADOWSKI: It's one of those days
14 of card counting.
15 BY MR. SADOWSKI:
16   Q  Okay. So as for Exhibit 6, Daniel, your
17 counsel has indicated that he's represented that this
18 is a screen print from the system from the second deed
19 of trust.
20   A  Okay.
21   Q  Do you believe him?
22      MR. VERSTANDIG: Just to be clear, I

Page 167

1  didn't say "from the system," and if you need me to
2  extrapolate there, I can.
3       MR. SADOWSKI: All right. Why don't
4  you just tell Daniel what it is so he knows what to
5  look at?
6       MR. VERSTANDIG: All right. I'll
7  represent as follows. The loan file that was produced
8  in this case for the second loan to Developer RE1
9  includes an Excel sheet that is demonstrative of the
10 payment history on the second loan. This is a print
11 of that Excel sheet.
12      THE WITNESS: Okay.
13 BY MR. SADOWSKI:
14   Q  Okay. Looking at Exhibit 6, can you tell me
15 whether, as of November 3, 2022, there was an overdue
16 payment under the second deed of trust?
17   A  Mr. Negussie was in default starting on
18 July 1st.
19   Q  That wasn't the question. The question was,
20 looking at Exhibit 6, as of November 3, 2022, what
21 payments under the second deed of trust were unpaid as
22 of that date?

Page 168

1   A  Right. I'm -- I'm responding based on what
2  I can answer in my role. I can see that Mr. Negussie
3  was defaulted as of July.
4   Q  Right. But that's not the question. The
5  question is, how much money was owed, or was any money
6  owed, as of November 3, 2022?
7   A  I can't -- I can't answer that question.
8  I'm not in the accounting department. I'm just going
9  to tell you, based on what I see, based on what you
10 presented to me, that Mr. Negussie was in default in
11 July.
12   Q  Okay. So you can't read this printout and
13 figure out whether or not there was an outstanding
14 amount due under the loan at any date.
15   A  No, I can't.
16   Q  All right.
17   A  I can just tell you, based on what I see
18 here in front of me when Mr. Negussie got in default.
19 Mr. Negussie started being default July.
20   Q  Right. But when was this notation put in
21 here, "defaulted"?
22   A  As I stated, I'm not in that department.

Page 169

1  You're asking me a question --
2   Q  I'm asking you to look at it right now.
3  What does it say?
4   A  I answered the question.
5   Q  Okay. Well, I'm looking at it, and I'm
6  looking at the first page. And the word "defaulted"
7  doesn't appear until February 1, 2023. Do you see
8  that? You're not looking at it.
9   A  No, because I answered your question. You
10 can -- you can ask me 20 different ways --
11   Q  No, you're evading the question.
12   A  No, you can ask me 20 different ways, like I
13 explained to you.
14   Q  On Exhibit 6, when is the first indication
15 that RE1 was in default? On Exhibit 6, where is it?
16      MR. VERSTANDIG: Object, but you can
17 answer.
18      THE WITNESS: I already answer your
19 question.
20 BY MR. SADOWSKI:
21   Q  You didn't answer the question. Okay. What
22 date was Developer RE1 noted in default?

43 (Pages 166 - 169)

Page 170

1  A  I'm looking -- I'm looking at the payment,
2  July 14th --
3  Q  Okay. And under the Servicing Status
4  Category --
5  A  I'm also -- I'm -- sir, I'm speaking. You
6  said not to interrupt me.
7  Q  You're right.
8  A  I don't interrupt you. So please, don't
9  interrupt me.
10  Q  Yeah.
11  A  Mr. Negussie has a copy of his promissory
12  notes, and according to the promissory notes and the
13  stipulation of it, as the deed of trust,
14  that's -- he's in default.
15      So I don't have to look at it here. I just
16  got to look at when the payment was made, July 14.
17  Q  That's not the question. The question is
18  where on Exhibit 6 does it indicate -- does it use the
19  word "defaulted"? What date was the first date?
20  A  I don't know how to answer your question.
21  I'm sorry.
22  Q  You can look at Exhibit 6, and you look for

Page 171

1  the word.
2  A  I already told you that Mr. Negussie is in
3  default.
4      MR. VERSTANDIG: All right. Hold on.
5  I object to the question. I won't give a speaking
6  objection.
7      MR. SADOWSKI: On what basis?
8      MR. VERSTANDIG: That said --
9      MR. SADOWSKI: A non-speaking
10  objection, basis?
11  BY MR. SADOWSKI:
12  Q  Where on this document --
13      MR. SADOWSKI: What's the objection?
14      MR. VERSTANDIG: Let me finish. With
15  my objection noted, and if you want -- but let me
16  finish because I think you're going to like where this
17  goes.
18      Mr. Huertas, you can look at the
19  document and indicate, just reading the document,
20  without any external scope of knowledge, where on that
21  document the word "defaulted" first appears, and you
22  can answer that question.

Page 172

1      And I don't have an objection to you
2  answering that question. Depending on how things get
3  rephrased, I may interpose a different objection in a
4  minute.
5      THE WITNESS: Right.
6      MR. VERSTANDIG: But you can indicate
7  where on this document the word "defaulted" first
8  appears.
9      THE WITNESS: Right. I see in this
10  document the word "default" appears in one, two -- on
11  the February 1, 2023, payment.
12  BY MR. SADOWSKI:
13  Q  Okay. And is that also correct -- from the
14  Servicing Status Column?
15  A  Well, that's where --
16      MR. VERSTANDIG: Can we stipule that
17  doesn't appear anywhere other than the Service --
18      MR. SADOWSKI: Yeah. Can I have the
19  witness here just --
20  BY MR. SADOWSKI:
21  Q  I'm talking about this.
22  A  Yeah, that's what I read.

Page 173

1  Q  Servicing Status.
2  A  Right.
3  Q  See that, those words. Right?
4  A  Yeah, that's what I see.
5  Q  Now, going to the next page, which is the
6  continuation of the spreadsheet --
7  A  Right.
8  Q  -- where does the word "defaulted" first
9  appear on that second page of Exhibit 6?
10      MR. VERSTANDIG: Hold on. I don't
11  think it's a continuation. I think it's just a
12  blowup.
13      THE WITNESS: Yeah, that's --
14      MR. SADOWSKI: You might be right.
15  Then I should be looking at the second page.
16  BY MR. SADOWSKI:
17  Q  Okay. All right. So the second page of
18  Exhibit 6 is just an enlarged version of the first
19  page.
20  A  Blurry version of the first page.
21  Q  Okay. All right. When does the system at
22  WCP start putting in the word "defaulted"?

44 (Pages 170 - 173)

Page 174

1  A   In this specific situation, it says right
2  here. The "defaulted" word appears on the
3  February 1st payment.
4  Q   Right. I got that. But I'm trying to --
5  A   Right.
6  Q   Okay. Why did it change from -- okay.
7  Let's go back. Let's go to another question. Looking
8  at the line right below February 1, 2023, there's a
9  date January 1, 2023. Do you see that?
10 A   Yeah. January 1, 2023, I see that.
11 Q   Okay. And in the Servicing Status, what
12 does it indicate in that column?
13 A   Well, it reads Servicing Status Current.
14 Q   Okay. So what does that mean, Serving
15 Status Current?
16 A   Well, I can tell you what it says here. It
17 says "current." It doesn't mean anything to me.
18 Q   Okay. Then why --
19 A   It says the word "current."
20 Q   -- do you use the terms "current,"
21 "defaulted," "late," "one to 15 days," "originated"?
22 Why are those terms used on servicing status?

Page 175

1  A   As I stated, this is an internal code for
2  this. So right now, it says "current."
3  Q   Okay. Who's in charge of making the codes?
4  A   Nobody's in charge of making the codes.
5  Q   Okay. What is your understanding of what
6  the word "current" means?
7  A   Like I said, the -- the coding here is -- it
8  says "current."
9  Q   All right. That's not the question. What
10 is your understanding about what the word "current"
11 means?
12 A   That for this specific line, it says that
13 activity is "current."
14 Q   Okay. So as of January 1, 2023, what, if
15 any, payment due under the loan was not current?
16 A   Except for that specific line, it says
17 "current."
18 Q   Okay. So as of that date, doesn't that mean
19 that there's no amount owed under the loan?
20 A   For that specific activity, it shows that
21 it's current.
22 Q   Okay, so 7.

Page 176

1      (Exhibit 7 was marked for
2      identification.)
3      THE WITNESS: What are these ones?
4      MR. VERSTANDIG: I will stipulate for
5  the record that this is a printout of an Excel sheet
6  with the loan file for the first promissory note that
7  correlates to the first deed of trust where Developer
8  RE1 is obligated on the promissory note and the
9  property situated at 5501/5505 1st Street serves as
10 collateral on the deed of trust.
11 Q   Okay. Mr. Huertas, what is Exhibit 7?
12 A   It's -- based on what I heard, it's -- it's
13 the first deed of trust for the subject property.
14 Q   And when does the word "defaulted" first
15 appear, in terms of time, on Exhibit 7 in the
16 Servicing Status Column?
17 A   Yeah. The -- the word "defaulted" appears
18 on Line 2-1-2023.
19 Q   Okay. And when does the -- the word
20 immediately below that is the word "current." Right?
21 A   Yes.
22 Q   And that indicates a date of January 1,

Page 177

1  2023. Correct, "current"?
2  A   For that particular activity, correct.
3  Q   Okay. Now, let's put 6 and 7 kind of next
4  to each other, if you will.
5      There's another column there that says
6  "Status Reason." Do you see that? It's the second
7  column from the left.
8  A   Yes.
9  Q   Okay. As of January 1, 2023, what does
10 Exhibit 6 indicate in the Status Reason Column?
11 A   In which one?
12 Q   Well, doesn't the word "paid" appear there?
13 A   In which line?
14 Q   One, two, three, four -- one, two, three,
15 four, five, six, seven lines down from the top.
16 A   The word -- it says "paid."
17 Q   Okay. And what does that indicate to you?
18 A   For that activity, it was paid.
19 Q   Okay. And isn't it true that on Exhibit 6,
20 the word paid appears before every date before
21 January 1, 2023, in the Status Reason Column?
22 A   The word "paid" appears in the other lines,

45 (Pages 174 - 177)

Page 178

1  yeah.
2  Q  Okay. And on Exhibit 7, isn't it also true
3  that the word "paid" appears on every line starting
4  with January 1, 2023, going down all the way to
5  December 23, 2021?
6     Isn't that correct that the word "paid"
7  appears in the Status Reason?
8  A  The word "paid" appears.
9  Q  And those dates there are corresponding to
10  what?
11  A  Those dates?
12  Q  Yeah. Isn't that a payment due date?
13  A  That's a payment due date.
14  Q  Okay. So to recap, on Exhibit 6 and
15  Exhibit 7, for every payment due on the date that's
16  listed on those two exhibits from December 23, 2021,
17  through January 1, 2023, it indicates "paid."
18  A  The word "paid" appears in those lines.
19  Q  Okay. And was RE1, in fact, current on the
20  payments due under the first deed of trust and the
21  second deed of trust as of January 1, 2023?
22  A  No.

Page 179

1  Q  Okay. What was outstanding as of those
2  two -- okay. Then why, if they were not current --
3  then why doesn't this indicate that?
4  A  I cannot tell you how the system was
5  generating that, but the borrower was not current.
6  Q  So what was incorrect about it? What's
7  incorrect about all those indications of "paid"?
8  A  July payment, as you can see, on both, it's
9  July 14th, borrower was in default in the month of
10  July.
11  Q  So what? So why does that change what's
12  listed here as "paid"?
13  A  I can't speak about a system that shows
14  that. I can just tell you --
15  Q  So your system doesn't work?
16  A  I guess not.
17  Q  All right. Who is the person most qualified
18  at WCP to answer questions about when amounts are paid
19  and unpaid under RE1's loans?
20  A  I think I'm qualified.
21  Q  Well, who's the best person? You said
22  before that you didn't know the records.

Page 180

1  A  Right.
2  Q  You weren't sure.
3  A  If you want specific details on accounting,
4  that would be somebody else.
5  Q  Who would that be?
6  A  My VP of finance.
7  Q  Who is that?
8  A  Christina Araujo.
9     MR. VERSTANDIG:  Alpha, Romeo, Alpha,
10  Uniform, Juliet, Oscar.
11     THE WITNESS:  Yeah.
12  BY MR. SADOWSKI:
13  Q  Okay. Okay. So let's go back to
14  Paragraph 29 of Exhibit 4.
15  A  Which page?
16  Q  Sorry, Page 5 of Exhibit 4, Paragraph 29.
17  A  Okay.
18  Q  And that's the same question that I asked a
19  few questions ago, several.
20     What amounts were outstanding under the RE1
21  first deed of trust or second deed of trust as of
22  November 3, 2022?

Page 181

1  A  I don't have the specific amounts.
2  Q  Okay. Well, these records here show
3  everything was paid. So if there was something that
4  was unpaid, what was it?
5     MR. VERSTANDIG:  Hold on. Objection,
6  the records do not show everything being paid on
7  November 3rd.
8     MR. SADOWSKI:  2022? They show being
9  paid as of January 1, 2023, two months later.
10     MR. VERSTANDIG:  You just asked as of
11  November 3, 2022. This record shows that the payment
12  due November 1st was made on November 9th.
13     MR. SADOWSKI:  You're coaching now,
14  Mr. VerStandig. Okay.
15  BY MR. SADOWSKI:
16  Q  What amounts on November 3, 2022, did RE1
17  owe under either the first deed of trust or the second
18  deed of trust?
19  A  I -- I already told you that.
20  Q  What did they owe?
21  A  I don't have the amounts.
22  Q  You don't know?

46 (Pages 178 - 181)

Page 182

1   A   It's more.  I don't have the amounts.
2   Correct.
3   Q   Okay.  If they owed money as of that date,
4   why isn't it reflected on Exhibit 6 and Exhibit 7?
5   A   That's a report.
6   Q   Okay.
7   A   You just issue a report.
8   Q   So what other reports are there out there
9   that I haven't seen?
10  A   That's the one report that we have.
11  Q   Okay.
12  A   But that's a report that we had for the
13  payments, specific to something, to just one aspect of
14  it.
15  Q   Okay.  When do late charges get posted to
16  the WCP accounting system?
17  A   Late charges are posted, or the system
18  generates a late charge on the 5th.
19  Q   Okay.  Are there any late charges shown on
20  the system printouts in Exhibit 6 and Exhibit 7?
21  A   It shows some late charges.
22  Q   Where?

Page 183

1   A   Line 10/1, 12/1.  I don't know if I'm doing
2   this right.  That's on Exhibit 7.  Look -- are we
3   looking at Exhibit 7 or Exhibit 6?
4   Q   The Late Fee Amount Due Column.
5   A   Yeah.  Which exhibit do you want me to look
6   at?
7   Q   They're both there.  They have the same
8   column.  Right?  So are you talking about this column
9   here, right here with these?  Exhibit 6, it says
10  "523.56."
11  A   It shows two in here for 10/6 and 12/6.
12  Q   Okay.  That's the 523.56 number.
13  A   Yeah.
14  Q   And then on the corresponding Exhibit 7,
15  there's two entries as well on that for 238.02.  Do
16  you see that?
17  A   Mm-hmm.
18  Q   Right?
19  A   Yeah.
20  Q   Were those late charges ever paid?
21  A   I can infer from here that the ACH cleared.
22  So I'm guessing, yes.

Page 184

1   Q   Okay.  All right.  So as of January 1, 2023,
2   what amounts, if any, were owed for late charges as of
3   that date?
4   A   I don't have the specific amount.  I don't
5   have a response to your question.
6   Q   Okay.  Who would be able to answer that
7   question?
8   A   I already give you a name, Christina Araujo.
9   Q   Okay.  All right.  Now, when did somebody at
10  WCP -- oh, well, sorry, strike that.
11      How does the system change from "current" to
12  "defaulted," as it did here on February 1, 2023?
13  A   I cannot tell you for everything, but for
14  this specific situation, I guess it changed on 2/1.
15  Q   Right.  But does someone have to manually go
16  in and click a button and say a "loan is in default"?
17  How does that work?
18  A   I don't know.
19  Q   Will Christina know the answer to that
20  question?
21  A   Maybe, I don't know if she could answer.
22  Q   Who else might know the answer to that

Page 185

1   question?
2   A   I have to ask.  I don't know.  I have to
3   ask.
4   Q   Okay.
5   A   It's a great question for me, too.  I need
6   to figure it out.
7   Q   Okay.  Now, let's go back to Exhibit 4.
8   A   Page?
9   Q   Five.
10  A   Page 5.
11  Q   Now, down to Paragraph 33, I'd ask you to
12  read that and let me know when you're done.
13  A   Okay.
14  Q   Is the information in Paragraph 33 accurate?
15  A   No.
16  Q   What's not accurate about it?
17  A   It is obvious that the developer couldn't
18  secure the financing; otherwise, we wouldn't be here.
19  Q   Okay.  Did you know as of November 15th,
20  when I say "you," did either you or WCP know that RE1
21  was in the process of refinancing a loan with Main
22  Street Bank?

47 (Pages 182 - 185)

Page 282

1 morning right before the sale.
2 BY MR. SADOWSKI:
3 Q Okay. And is there a WCP investment
4 vehicle, whether it's an entity or not -- let me take
5 that back.
6 So let's assume we're at the day of the
7 foreclosure. What, in your experience, would WCP do
8 to make sure that it had a buyer prepared to meet the
9 criteria for the foreclosure sale at the foreclosure
10 sale?
11 How do you plan for that? What do you do?
12 Like, do you send somebody there? Do you create a new
13 entity? Those are the kind of questions I'm going to
14 have.
15 A Right, I understand. For this specific
16 situation, we don't have anything at this time.
17 This happened on Tuesday. So prior to the
18 sale, maybe the night before or the morning of, we'll
19 figure out where we stand and make a determination.
20 Q And who will be involved in that process,
21 other than any legal counsel?
22 A I get involved in that process.

Page 283

1 Q And who else besides you?
2 A I do it for the most part. I try not to get
3 involved -- more people, but I do it for the most
4 part.
5 Q Okay. When there was a foreclosure of
6 2507 I Street -- there was one. Right?
7 A Yes.
8 Q Who ended up buying the property at
9 foreclosure?
10 A The lender took it back.
11 Q So what? Did the lender buy it, or did the
12 lender create some interim entity to serve as the
13 buyer?
14 A The lender took it back because there were
15 no bidders at the foreclosure sale.
16 Q Oh, okay. And of these other properties
17 that you mentioned that were "problematic," I'm just
18 using the term loosely.
19 A Right.
20 Q Did Holbrook go to foreclosure?
21 A I'm sorry. Which one?
22 Q 1262 Holbrook.

Page 284

1 A 1262 through 1268, again, that property, as
2 I recall, I believe we didn't have any real bidders on
3 the other end.
4 It was a second subject to the first. So
5 some people just -- and then most people don't want to
6 bid on a second trust just because they don't know the
7 nature of the first.
8 Q Okay. So what are WCP's expectations as to
9 this foreclosure, given that you're foreclosing under
10 the second deed of trust?
11 A I don't have any expectations; our goal is
12 to get our money back.
13 MR. SADOWSKI: So we're at exactly your
14 five o'clock. We, obviously, didn't finish. I don't
15 know that I can reconvene tomorrow, and I think you'd
16 probably rather work on your --
17 MR. VERSTANDIG: I mean, candidly, I
18 would.    MR. SADOWSKI: Yeah.
19 MR. VERSTANDIG: Hold on. We can do
20 this on the record. It may make sense to assess after
21 Friday anyway.
22 MR. SADOWSKI: Of course, right. So

Page 285

1 we're going to leave it open. It's not completed
2 because we didn't finish either by time.
3 And then there are also some
4 outstanding document issues that we probably need to
5 address, but we'll agree to reconvene the deposition
6 at a mutually convenient date and time.
7 MR. VERSTANDIG: And for the record, I
8 will cross him at the close of the deposition.
9 MR. SADOWSKI: Okay.
10 THE WITNESS: How many hours did it go?
11 MR. SADOWSKI: Doctor's appointment, my
12 friend, go, go.
13 THE WITNESS: No, I understand.
14 THE REPORTER: Should I take us off?
15 MR. SADOWSKI: Yes.
16 THE REPORTER: We're off the record at
17 5:01 p.m.
18 (Signature waived.)
19 (Whereupon, at 5:01 p.m., the
20 proceeding was concluded.)
21
22

72 (Pages 282 - 285)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 286

1     CERTIFICATE OF DEPOSITION OFFICER
2        I, MATTHEW YANCEY, the officer before whom
3     the foregoing proceedings were taken, do hereby
4     certify that any witness(es) in the foregoing
5     proceedings, prior to testifying, were duly sworn;
6     that the proceedings were recorded by me and
7     thereafter reduced to typewriting by a qualified
8     transcriptionist; that said digital audio recording of
9     said proceedings are a true and accurate record to the
10    best of my knowledge, skills, and ability; that I am
11    neither counsel for, related to, nor employed by any
12    of the parties to the action in which this was taken;
13    and, further, that I am not a relative or employee of
14    any counsel or attorney employed by the parties
15    hereto, nor financially or otherwise interested in the
16    outcome of this action

17             MATTHEW YANCEY
18           Notary Public in and for the
19              District of Columbia
20
21
22

Page 287

1     CERTIFICATE OF TRANSCRIBER
2        I, AMY DAMOTH, do hereby certify that this
3     transcript was prepared from the digital audio
4     recording of the foregoing proceeding, that said
5     transcript is a true and accurate record of the
6     proceedings to the best of my knowledge, skills, and
7     ability; that I am neither counsel for, related to,
8     nor employed by any of the parties to the action in
9     which this was taken; and, further, that I am not a
10    relative or employee of any counsel or attorney
11    employed by the parties hereto, nor financially or
12    otherwise interested in the outcome of this action.
13

14    _____
15             AMY DAMOTH
16
17
18
19
20
21
22

73 (Pages 286 - 287)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830